I, ANTHONY FRY, being duly sworn, deposes and says that I am a Special Agent with the Federal Bureau of Investigation ("FBI"), duly appointed according to law and acting as such.

Upon information and belief, in and around July 2019, within the Northern District of Ohio and elsewhere, the defendants, DROR SVORAI, ELI TAIEB, and CHARLES VACCARO, together with others, did knowingly and intentionally attempt to execute a scheme and artifice to defraud investors and potential investors in connection with securities of issuers with a class of securities registered under Section 12 of the Securities Exchange Act of 1934, specifically PotNetwork Holdings, Inc., Clic Technology, Inc., White Label Liquid, Inc., Canna Corporation, and Vapor Group, Inc. to obtain money and property from investors and potential investors by means of materially false and fraudulent pretenses, representations, and promises in connection with purchases and sales of securities of issuers with a class of securities registered under Section 12 of the Securities Exchange Act of 1934, specifically, PotNetwork Holdings, Inc., Clic Technology, Inc., White Label Liquid, Inc., Canna Corporation, and Vapor Group, Inc. in violation of Title 18, United States Code, Sections 1348 and 1349.

In addition, based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 18, United States Code, Sections 1343 (Wire Fraud), 1348 (Securities Fraud), and 1349 (Conspiracy to Commit Wire and Securities Fraud) have been committed by DROR SVORAI, ELI TAIEB, and CHARLES VACCARO and others, known and unknown, in the Northern District of Ohio and elsewhere.

The source of you affiant's information and the grounds for his belief are as follows:

## INTRODUCTION

1. I have been a Special Agent with the FBI since September 2018. I am currently assigned to an FBI squad which investigates securities fraud, wire fraud, and other financial crimes. During my tenure with the FBI, I have participated in financial fraud investigations involving stock market manipulation and other illegal manipulative trading schemes. I have participated in all aspects of

investigations including executing search warrants, debriefing defendants and informants, interviewing witnesses, and reviewing and analyzing recorded conversations.

2. I have personally participated in the investigation of securities fraud by the defendants, DROR SVORAI, ELI TAIEB, and CHARLES VACCARO, among others, as discussed below. I am familiar with the facts and circumstances of this investigation from, among other things: (a) my personal participation in this investigation, (b) discussions with other law enforcement agents and undercover law enforcement agents involved in this investigation, and (c) my review of consensual recordings, among other sources of evidence.

3. Except as explicitly set forth below, I have not distinguished in this affidavit between facts of which I have personal knowledge and facts of which I learned from other law enforcement agents. Because this affidavit is being submitted for the limited purpose of establishing probable cause to arrest the defendants and seize the below-identified bank account, I have not set forth each and every fact learned during the course of the investigation. Instead, I have set forth only those facts that I believe are necessary to establish probably cause for the arrest and seizure warrants sought herein. In addition, where the contents of documents, or the actions, statements, and conversations of others are reported herein, they are reported in sum and substance in part, except where otherwise indicated. Summaries of recorded conversations are based upon draft transcripts and summaries of these conversations which are subject to revision.

## PROBABLE CAUSE

Relevant Regulatory Principles and Definitions

4. "Microcap" or "penny" stocks refer to stocks of publicly traded U.S. companies which have a low market capitalization. Microcap stocks are often subject to price manipulation because they are thinly traded and subject to less regulatory scrutiny than stocks that are traded on notable exchanges. Additionally, large blocks of microcap stock are often controlled by a small group of individuals, which enable those in the group to control or orchestrate manipulative trading in those

stocks. "Caveat Emptor Designation", commonly referred to as a "skull and crossbones" is assigned by OTC Markets Group, Inc. ("OTC") to when OTC becomes aware of: (a) a stock promotion, (b) an investigation of fraud or other criminal activities, (c) a suspension or halt from a regulatory authority or exchange, (d) undisclosed corporate actions, or (e) other public interest concerns.

5. Market manipulation schemes known as "pump and dump" schemes involved creating a price for a security that was not reflective of true market value, allowing the defendants holding large blocks of the inflated stock to sell shares they obtained for little or no money at the inflated price. The purchasing party was left with a near-worthless security when the price dropped to accurately reflect the stocks true value, or lack thereof, in the market. There were generally three phases to a pump and dump scheme: (a) first, obtaining and concealing control of a significant portion of a publically traded company's stock, (b) second, fraudulently inflating or keeping inflated the price and trading volume of the company's stock through a variety of means; and (c) third, once the price of the stock was fraudulently inflated, selling the stock using the fraudulently inflated price as a benchmark, thereby profiting at the expense of the investing public.

The Defendants and The Publicly Traded Companies

6. DROR SVORAI's address listed with the Florida Department of Motor Vehicles ("DMV") is 1065 Lyontree Street, Hollywood, Florida 33019.

7. ELI TAIEB's address listed with the Florida DMV is 3329 Bradenham Lane, Davie, Florida 33328.

8. CHARLES VACCARO's address listed with the Florida DMV is 18911 Collins Avenue, Apt 1603, Sunny Isles Beach, Florida 33160. According to the Financial Industry Regulatory Authority's ("FINRA") Broker Check database, VACCARO has a significant regulatory history in the securities industry, including serving as the President of a brokerage firm that was expelled from the industry by FINRA. In 2003, VACCARO was fined $30,000 and suspended for 30 days due to the member firm acting through VACCARO failing to: (a) supervise inter-customer lending practices, (b) failed to establish, maintain, and enforce special procedures for supervising telemarketing activities of

all of its registered representatives, (c) failed to register an associated person who was required to be registered as a general securities representative, (d) failed to file any reports, including an arbitration settlement, (e) failed to maintain the required minimum net capital while conducting a securities business, (f) failed to prepare and keep current books and records and file accurate focus reports, (g) failed to employ an independent auditor to prepare the firm's 2001 annual audit, and (h) failed to file its December 2001 annual audit in a timely manner. In 2014, FINRA awarded a customer $3,262.00 judgement against VACCARO regarding allegations related to the return of funds withdrawn from the claimant's account. In 2015, VACCARO was suspended from working in any capacity for failure to comply with an arbitration award or settlement agreement or to satisfactorily respond to a FINRA request to provide information concerning the status of compliance.

9. In and around July 2019, PotNetwork Holdings, Inc. ("PotNetwork") was a publicly-traded Colorado corporation with its principal place of business in Fort Lauderdale, Florida. PotNetwork was a microcap or penny stock, whose shares were traded under the ticker symbol "POTN" on OTC. PotNetwork purported to conduct its operations through its two wholly owned subsidiaries, First Capital Venture Co., and PotNetwork Media Group, Inc. PotNetwork purported to be a holding company whose subsidiaries sell numerous CBD Oil products, and operate www.potnetwork.com, an informational website on the overall cannabis industry. PotNetwork marketed itself on its website as being focuses on the booming cannabis industry and related verticals.

10. In and around July 2019, Clic Technology, Inc. ("Clic") was a publicly-traded Nevada corporation with its principal place of business in Aventura, Florida. Clic was a microcap or penny stock, whose shares were traded under the ticker symbol "CLCI" on OTC. Clic purported to operate as a developer, integrator, and marketer of blockchain products and services.

11. In and around July 2019, White Label Liquid, Inc. ("White Label") was a publicly-traded Wyoming corporation with its principal place of business in Cheyenne, Wyoming. White Label was a microcap or penny stock, whose shares were traded under the ticker symbol "WLAB" on OTC. White

Label purported to be a manufacturer of e-liquids and hemp derived CBD products, which are private labeled.

12. In and around July 2019, Canna Corporation (Canna) was a publicly-traded Colorado Corporation with its principal place of business in Miami, Florida. Canna was a microcap or penny stock, whose shares were traded under the ticker symbol "CNCC" on OTC.

13. In and around July 2019, Vapor Group, Inc. ("Vapor") was a publicly-traded Florida corporation with its principal place of business in Daytona Beach, Florida. Vapor was a microcap or penny stock, whose shares were traded under the ticker symbol "VPOR" on OTC. Vapor purported to operate through its wholly owned subsidiary, VPOR, Inc., a bulk wholesaler of high quality, raw hemp-derived CBD in a range of forms.

14. In or and around July 2019, D&D Capital, Inc. was a Florida corporation with its principal place of business in Miami, Florida.

Account to be Seized

15. Wells Fargo Bank NA, Account #2000042269454, Account Name: D&D Capital, Inc. As set forth below, the account is controlled by DROR SVORAI. This Affidavit is being submitted pursuant to and in accordance with the following forfeiture statutes:

a. 18 U.S.C. § 981(a)(1)(C) & 28 U.S.C. § 2461(c) - criminal forfeiture authority (proceeds) for 18 U.S.C. § 1348, 18 U.S.C. § 1349, and 18 U.S.C. § 1343 violations.

b. 18 U.S.C. § 981(a)(1)(C) – civil forfeiture authority (proceeds) for 18 U.S.C. § 1348, 18 U.S.C. § 1349, and 18 U.S.C. § 1343 violations.

c. 21 U.S.C. § 853(f) and § 853(l) [as incorporated by 28 U.S.C. § 2461(c) - criminal seizure warrant authority.

d. 18 U.S.C. § 981(b) - civil seizure warrant authority.

The Fraudulent Scheme

16. In and around July 2019, defendant CHARLES VACCARO was introduced to an undercover law enforcement agent "Undercover Agent 1." Undercover Agent 1 posed as a middleman with contacts at foreign brokerage firms.

17. On or about July 2, 2019, during a consensually monitored interstate telephone conversation, VACCARO, and Undercover Agent 1 discussed a scheme to liquidate shares of stock through offshore brokerage accounts. VACCARO informed Undercover Agent 1 that they had over $100 million of stock to liquidate in four or five companies. VACCARO acknowledged the United States had tightened up the scrutiny on OTC stocks and it had become more difficult, if not impossible to do business in the United States. Undercover Agent 1 advised VACCARO that he could sell shares of stock through his foreign brokerage accounts for VACCARO. VACCARO expressed the desire to open his own offshore brokerage account and bank account. VACCARO inquired if he, TAIEB, and SVORAI could partner with Undercover Agent 1, be added to and have control of the offshore account. VACCARO stated he could supply enough shares to liquidate $1 million per week and he desired to sell 20% of the daily market volume. Undercover Agent 1 and Cooperating Witness 1 ("CW1") inquired about the type of issuers VACCARO held stock in and if the risk of skull and crossbones. VACCARO stated the issuers are a mix of OTCQB and OTC Pink companies, and they had recently experienced a trading skull and crossbones due of significant volume, which drove the stock from $0.10 to $2.79. Undercover Agent 1 and CW1 stated they could clear shares for VACCARO for a discount between 30% and 50%, but given the volume VACCARO had, they would accept a 30% discount. VACCARO stated 30% was as high as he had ever paid.

18. In and around July 2019, defendant DROR SVORAI was introduced a second undercover law enforcement agent ("Undercover Agent 2"). Undercover Agent 2 posed as a contact of Undercover Agent 1 who could use bank accounts maintained through a construction business to transfer money into the United States.

19. On or about July 16, 2019, during a consensually monitored interstate telephone conversation, SVORAI, and Undercover Agent 2 discussed a scheme to launder proceeds of stock liquidated abroad into the United States. SVORAI discussed how he, VACCARO and TAIEB sold stock offshore through the another individual, which resulted in problems returning the money back to the United States. Undercover Agent 2 advised he could use his business accounts to transfer the money into the U.S. Undercover Agent 2 agreed to send SVORAI $60,000 for three consecutive days, followed by transfers of $50,000 for 5 days, transfers of $100,000 for 5 days, and additional transactions as required. The total amount of money owed to SVORAI, VACCARO, and TAIEB was approximately $2,000,000. Undercover Agent 2 discussed creating documentation to back up the transactions. SVORAI advised Undercover Agent 2 to send the money to his account [the account to be seized], and they could later switch the transfers to VACCARO or TAIEB's accounts. SVORAI stated his Wells Fargo account [the account to be seized] had been open for approximately 10 or 11 years, had plenty of money move through it. SVORAI stated the account had millions in it and they had invested millions out of the account. Undercover Agent 2 was located in the Northern District of Ohio.

20. On or about July 16, 2019, during a consensually monitored interstate telephone conversation, SVORAI inquired to Undercover Agent 2 what SVORAI could say if he was ever questioned why he had received money from Undercover Agent 2. Undercover Agent 2 advised that is why they agreed to have a consulting agreement in place. SVORAI stated under the current arrangement he could point to the stock sales as the source of funds. Undercover Agent 2 and SVORAI discussed potential consulting work SVORAI could say he completed for Undercover Agent 2's construction business, which would be backed up by invoices and contracts. Undercover Agent 2 was located in the Northern District of Ohio.

21. On or about July 16, 2019, SVORAI transmitted a text message to the Northern District of Ohio with wire instructions for [the subject] SVORAI's Wells Fargo Bank account ending in 9454 in the name of D&D Capital Inc. The bank branch address provided was "4491 s state rd 7 David FL 33314".

22. On or about July 16, 2019, SVORAI clarified that "David" was a typographical error and meant Davie, Florida. SVORAI confirmed the city for the bank branch was Davie, Florida.

23. On or about July 17, 2019, SVORAI transmitted an email message containing an attached consulting agreement between D&D Capital, Inc. and Undercover Agent 2's company.

24. On or about July 17, 2019, Undercover Agent 2, from the Northern District of Ohio, initiated a wire transfer totaling approximately $20,000 from a government controlled bank account to [the subject] D&D Capital, Inc.'s Wells Fargo Bank account ending in 9454.

25. On or about July 17, 2019, during a consensually monitored interstate telephone conversation, TAIEB, and Undercover Agent 1 discussed a scheme to sell shares on stock on behalf of TAIEB, VACCARO and SVORAI. TAIEB learned from another person that SVORAI had confirmed receipt of the first $20,000 wire from Undercover Agent 2. TAIEB discussed how he, VACCARO and SVORAI had been selling shares of stock offshore through another person. Undercover Agent 1 discussed options with TAIEB which would depend on the stock ticker and the trading volume. Undercover Agent 1 stated it would depend if TAIEB provided promotional support or if Undercover Agent 1 would have to provide it. TAIEB stated that marketing and public relations ("PR") was done by the Company, and the PR gives the stock momentum. TAIEB stated he, VACCARO and SVORAI held shares in five companies from debt conversions. TAIEB advised that given the amount of shares they owned or controlled, he would prefer they set up a system, where the shares are deposited with Undercover Agent 1, and when the shares are sold, 80% of the proceeds would be wired back to TAIEB, SVORAI, and VACCARO, and Undercover Agent 1 would keep 20%. TAIEB described their business model of buying shell companies and take approximately 20% ownership in the shell. TAIEB stated they are willing to pay a higher discount to Undercover Agent 1 than to another broker ("Broker 1"). TAIEB stated the need to deposit the shares elsewhere because Broker 1 had gotten more complicated. TAIEB directed that Undercover Agent 1 be provided two ticker symbols to look at, one controlled by VACCARO and SVORAI, each. TAIEB stated with the companies making announcements there would be higher volume. TAIEB described under an arrangement with Undercover Agent 1, he would not

conduct small transactions and would not want Undercover Agent 1 to contact the CEOs of the publicly traded companies for small matters. Undercover Agent 1 inquired to TAIEB about the skull and crossbones on CLCI and WLAB, who stated the designations will be removed Monday and by the time Undercover Agent 1 started selling shares the stocks will be ready. TAIEB discussed a new stock ticker that TAIEB, VACCARO and SVORAI control shares in, which TAIEB indicated was ready but they believed they could deposit the shares themselves. TAIEB directed that Undercover Agent 1 be provided information on CLCI, WLAB, POTN, and information on the stocks SVORAI had shares to liquidate. TAIEB indicated SVORAI's stock had nice volume despite the lower price of the stocks. TAIEB stated under the system either they all make money or they do not.

26. On or about July 18, 2019, during a consensually monitored interstate telephone conversation, TAIEB, and Undercover Agent 1 discussed liquidating shares of VPOR. Undercover Agent 1 discussed the arrangement with TAIEB to sell shares, starting with one ticker for a 20% discount. TAIEB was told that SVORAI wanted to start Undercover Agent 1 on shares of VPOR. TAIEB stated Undercover Agent 1 should look at VPOR's volume for the last 60 days, because there was no PR in the last 30 days due to the company making changes. TAIEB stated with the PR and the announcements VPOR has, it is usually nice momentum. Undercover Agent 1 asked about the yield sign OTC placed on VPOR. TAIEB explained the yield sign is due to new OTC pink sheet requirements to disclose every debtholder, the company name and individual name, how much they have converted and how much they have sold. VPOR and the debt holders did not want to disclose that information so they have left the yield sign so the yield sign will remain on VPOR. TAIEB asked Undercover Agent 1 whether he cleared shares through a broker-dealer in the U.S. or overseas. Undercover Agent 1 stated he used an offshore broker-dealer. TAIEB stated they would provide Undercover Agent 1 with VPOR stock first and see how the momentum goes, and the volume that Undercover Agent 1 would be able to sell. Every Friday, Undercover Agent 1, would send a report of the volume sold Monday through Friday and would wire 80% back to TAIEB, SVORAI and VACCARO. Per the agreement, Undercover Agent 1 would receive 704 million shares of VPOR. TAIEB stated there is a lot of money to be made. Their

prior system created red flags due to the volume of cash from sale of shares. TAIEB stated these deals would make a lot of money, not just make a living. Undercover Agent 1 asked TAIEB to let him know when they are expecting volume surges in VPOR. TAIEB indicated they do not control the PR, but if the stock starts strong first thing in the morning he should know it will be a big day.

27. On or about July 18, 2019, during a consensually monitored interstate telephone conversation, SVORAI, and Undercover Agent 1 discussed Undercover Agent 1 selling shares of VPOR. Undercover Agent 1 informed SVORAI of his previous conversation with TAIEB regarding selling of shares in VPOR. SVORAI stated they have not done anything to help the volume on VPOR due to the hiccup in selling shares and receiving wires. SVORAI stated there was so much business and so much to take about with VPOR. SVORAI discussed CNCC, which he described as ready to explode. SVORAI stated a $2,000 trade on CNCC would increase the price to $0.50 per share. CNCC has a small float, which shows 11,000,000 shares but his brothers hold some stock in book form. SVORAI stated the real float is 3,000,000 or 4,000,000, and half of the float was bought by friends and family a year ago. Once SVORAI, TAIEB, and VACCARO begin on CNCC, SVORAI believed it could go to $1 or $2 per shares. They have negotiated subsidiaries to put into CNCC, , including one with $80,000,000 in sales. SVORAI reiterated the need for a new system with Undercover Agent 1 to sell shares. SVORAI stated says will start with VPOR, then move to POTN, followed by the other stock tickers over time. SVORAI communicated his prior concerns about the wires from Undercover Agent 2. SVORAI stated they could make $2,000,000 or $3,000,000 in one month and will bring in awareness if they need to. Based on my training, experience and discussions with other law enforcement agents, awareness when used in context of securities generally means promoting a stock. SVORAI stated pay per click promotion would generate more volume, and it was harder for OTC to find out about it. SVORAI indicated they could spend $100,000 or $200,000 per week per symbol. Undercover Agent 1 and SVORAI discussed the fee Undercover Agent 1 would receive, which aligned with Undercover Agent 1's previous conversation with TAIEB, in which they agreed on 20%.. SVORAI stated Undercover Agent 1 sell and pay SVORAI, TAIEB, and VACCARO every Friday or Monday.

Undercover Agent 1 stated it takes approximately 5 or 6 days to deposit and an additional 2 days for compliance. SVORAI stated the debt is 3 or 4 years old from 4A1 conversions. SVORAI stated they need to get the medallion switched to get the shares to Undercover Agent 1. SVORAI stated between all of them, they hold approximately 6 or 7 billion shares of VPOR, that are all converted and sitting in book form. SVORAI discussed two additional shells he, TAIEB, and VACCARO planned to purchase. They will put a training app into one, and a CBD company into the other shell. SVORAI told Undercover Agent 1 that they could sell $4 or $5 million per month.

28. On or about July 19, 2019, approximately $20,000 was wired from a government controlled bank account to [the subject] D&D Capital's Wells Fargo Bank account ending in 9454.

29. On or about July 19, 2019, approximately $20,000 was wired from a government controlled bank account to [the subject] D&D Capital's Wells Fargo Bank account ending in 9454.

30. In sum, from approximately July 17 to July 19, 2019, Undercover Agent 2 wired approximately $60,000 to [the subject] D&D Capital's Wells Fargo account ending in 9454.

## CONCLUSION

WHEREFORE, based on the foregoing, your affiant respectfully requests that an arrest warrant be issued for the defendants DROR SVORAI, ELI TAIEB, and CHARLES VACCARO, so that they may be dealt with according to law.

Further, based upon the foregoing, your affiant respectfully submits there is probable cause to believe that the contents of the subject Wells Fargo Bank NA, Account #2000042269454, constitute – or are derived from – proceeds traceable to violations of Title 18, United States Code, Sections 1348, 1349, and 1343 and, therefore, are subject to seizure and forfeiture by the United States pursuant to 18 U.S.C. § 981(a)(1)(C) & 28 U.S.C. § 2461(c) (criminal forfeiture authority) and 18 U.S.C. § 981(a)(1)(C) (civil forfeiture authority). Therefore, I respectfully request that a seizure warrant be issued for the contents of

the subject bank account, and state that a protective order would not be sufficient to assure the availability of the property for forfeiture.

Because public filing of this document could result in risk of flight by the defendants DROR SVORAI, ELI TAIEB, and CHARLES VACCARO, as well as jeopardize the government's ongoing investigation, your affiant respectfully requests that this affidavit, as well as any arrest and seizure warrants issued in connection with this complaint, be filed under seal.

Anthony Fry, Special Agent
Federal Bureau of Investigation

Sworn to via telephone after submission by reliable electronic means. Crim.Rules. 4.1; 41(d)(3)



Thomas M. Parker
United States Magistrate Judge
5:06 PM, Jul 19, 2019